Michael HARRISON, Appellant–
Plaintiff,

v.

VEOLIA WATER INDIANAPOLIS,
LLC, Appellee–Defendant.

No. 49A04–0912–CV–722.

Court of Appeals of Indiana.

June 29, 2010.

W.F. Conour, Timothy F. Devereux, Conour Law Firm, LLC, Indianapolis, IN, Attorneys for Appellant.

Joseph M. Dietz, Neil A. Davis, Andrew M. Sumerford, Meils Thompson Dietz & Berish, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Michael Harrison appeals the trial court's grant of summary judgment in favor of Veolia Water Indianapolis, LLC ("Veolia"). We reverse and remand.

### Issue

The sole restated issue before us is whether Veolia is entitled to summary judgment because it is a political subdivision of the State, and Harrison failed to give it notice of his claim against it in accordance with the Indiana Tort Claims Act ("ITCA").

### Facts[1]

For over one hundred years, the City of Indianapolis's ("City's") water utility was operated by the Indianapolis Water Company ("IWC"), a private company, through a franchise granted by the City. In 2001, the City created the Department of Waterworks ("the Department"); that same year, the City purchased IWC's assets and transferred management of the water utility to the Department.

On March 21, 2002, the Department and U.S. Filter Operating Services, Inc., entered into a Management Agreement, transferring responsibility for the operation, management, and maintenance of the water utility to U.S. Filter. U.S. Filter later assigned the Management Agreement to USFilter Indianapolis Water, LLC, and this company later changed its

1. Harrison failed to submit to this court the trial court's chronological case summary, which is a document required to be included in appendices. *See* Ind. Appellate R. 50(A)(2)(a). Additionally, appendices must contain a table of contents "specifically identify[ing] each item contained in the Appendix...." Ind. App. R. 50(C). The tables of contents in each of three volumes of appendices submitted by Harrison are very general. For example, the first volume, which is 250 pages long, has a table of contents stating only that it includes Veolia's motion for summary judgment plus two exhibits. It does not specify what page the exhibits are on, or identify what the exhibits are. For future reference, tables of contents for appendices must be more detailed.

name to Veolia. Under the Management Agreement, the City pays Veolia approximately $40 million per year, plus additional sums if Veolia meets certain incentives. Veolia, incorporated in Delaware, is a wholly-owned subsidiary of Veolia Water North America ("VWNA"), which in turn is a subsidiary of Veolia Environment ("VE"), a French corporation with multi-billion dollar annual revenues. VWNA "is an organization that generally operates and maintains facilities for municipalities and industrials dealing with wastewater and water treatment."[2] App. p. 505.

On December 14, 2006, Harrison was working for his employer, Corbitt & Sons Construction, which was a Veolia subcontractor. Harrison was working on a water line installation project when, he alleges, he received a severe electrical shock from an uninsulated overhead electrical line. Harrison filed suit against Veolia on June 3, 2008, asserting Veolia had been negligent in various ways with respect to the exposed electrical line. Harrison had not provided any other notice to Veolia of his injury or intention to sue.

Veolia filed a motion for summary judgment, claiming Harrison's lawsuit was barred because Veolia is a political subdivision of the State and Harrison had not provided a tort claim notice within 180 days of the alleged incident, as required by ITCA. On November 17, 2009, the trial court entered summary judgment in favor of Veolia. Harrison now appeals.

### Analysis

■ When reviewing a summary judgment ruling, we apply the same standard as the trial court. *Auto–Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1282 (Ind. 2006). Summary judgment is proper "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C); *Harvey*, 842 N.E.2d at 1282. We must construe all facts and reasonable inferences drawn from them in favor of the nonmoving party. *Harvey*, 842 N.E.2d at 1282. We may affirm a summary judgment ruling if it is sustainable on any legal theory or basis found in the evidentiary matter designated to the trial court. *West American Ins. Co. v. Cates*, 865 N.E.2d 1016, 1020 (Ind.Ct.App. 2007), *trans. denied.*

Tort claims against the State and its agencies and political subdivisions are governed by ITCA, Indiana Code Chapter 34–13–3. Any claim against a political subdivision of the State is barred unless a plaintiff files notice with the "governing body of that political subdivision" within 180 days after a loss occurs. Ind.Code § 34–13–3–8. It is undisputed that Harrison did not provide any such notice to Veolia. Political subdivision for purposes of ITCA is defined by statute as a:

(1) county;

(2) township;

(3) city;

(4) town;

(5) separate municipal corporation;

(6) special taxing district;

(7) state educational institution;

(8) city or county hospital;

(9) school corporation;

(10) board or commission of one (1) of the entities listed in subdivisions (1) through (9);

---

2. Lanita McCauley Bates, a Veolia vice-president, originally stated in her deposition that Veolia provided these services. In an errata sheet, Bates clarified that it was VWNA, not Veolia, that provided these services. Veolia only provided municipal water utility services for the City.

(11) drug enforcement task force operated jointly by political subdivisions;

(12) community correctional service program organized under IC 12–12–1; or

(13) solid waste management district established under IC 13–21 or IC 13–9.5–2 (before its repeal).

I.C. § 34–6–2–110. While acknowledging that it does not fall under the express statutory definition of a "political subdivision," Veolia asserts nonetheless that it is sufficiently akin to a governmental entity or political subdivision of the State that it is entitled to ITCA's procedural protections.

Although the issue here is not, strictly speaking, one of sovereign immunity, we believe it is necessary to review the history of sovereign immunity in Indiana and the adoption of ITCA.[3] Sovereign immunity originated in the English concept that "the king could do no wrong." *Campbell v. State*, 259 Ind. 55, 57, 284 N.E.2d 733, 734 (1972). The states adopted this principle after the Revolutionary War because "the new government was not financially secure enough to face claims of negligence in its governmental activities." *Id.* at 58, 284 N.E.2d at 734. However, various exceptions to common law sovereign immunity began arising, starting in Indiana in 1889. *Id.*, 284 N.E.2d at 734–35 (quoting *City of Goshen v. Myers*, 119 Ind. 196, 199, 21 N.E. 657, 658–59 (1889)).

One principle that became well-settled was "that if a governmental body is negligent in performing a proprietary function, it will be liable for its negligence; while, if an activity is classified as governmental, the defense of sovereign immunity shall apply." *Id.*, 284 N.E.2d at 735. Over the years, however, it became very difficult to define exactly what constituted a "proprietary function" versus a "governmental function." *Id.* Despite the difficulty of defining what constituted a "proprietary function" for which a municipality could be held liable if it had been performed negligently, there were numerous cases clearly establishing that a municipality's operation of a public utility, such as electricity and water, was a "proprietary" function to which sovereign immunity did not attach. *See, e.g., Public Serv. Co. of Indiana v. City of New Castle*, 212 Ind. 229, 237, 8 N.E.2d 821, 824 (1937) (holding "[i]t is well settled that" when a city furnishes and sells electricity "for domestic and commercial purposes, it acts as a private business corporation, and . . . is subject to the rules governing private corporations."); *City of Logansport v. Public Serv. Comm'n*, 202 Ind. 523, 532, 177 N.E. 249, 252 (1931) (holding, "When a municipal corporation engages in an activity of a business, rather than one of a governmental nature, such as the supply of light or water . . ., it acts as such corporation and not in its sovereign capacity, . . . and a city operates its municipally owned utility plant in its proprietary capacity as a private enterprise subject to the same liabilities, limitations, and regulation as any other public utility. . . ."); *Aiken v. City of Columbus*, 167 Ind. 139, 150, 78 N.E. 657, 661 (1906) (holding that municipality did not enjoy sovereign immunity with respect to operation of public lighting system); *cf. also City of Anderson v. Indiana Dep't of State Revenue*, 406

---

**3.** Additionally, it is apparent ITCA was enacted in response to the developing common law regarding sovereign immunity. *See King v. Northeast Sec., Inc.*, 790 N.E.2d 474, 478 (Ind.2003). Although ITCA contains provisions other than those related to sovereign immunity, there is only one definition of "political subdivision" for all of ITCA. We do not believe it advisable to craft differing definitions of "political subdivision" for differing provisions of ITCA.

N.E.2d 346, 348 (Ind.Ct.App.1980) (noting in case concerning municipality liability for state taxes, " 'In Indiana it has long been recognized that the operation of public utilities by a municipality for service to its inhabitants constitutes a proprietary and not a governmental activity.' ") (quoting *Department of Treasury v. City of Linton,* 223 Ind. 363, 366, 60 N.E.2d 948, 950 (1945)).

In 1967, this court completely abolished the right of municipalities to claim the defense of sovereign immunity. *Brinkman v. City of Indianapolis,* 141 Ind.App. 662, 666, 231 N.E.2d 169, 172 (1967), *trans. denied.* The *Brinkman* court based its holding largely on the unworkability of the governmental-proprietary rule. In *Klepinger v. Board of Commissioners,* 143 Ind. App. 155, 239 N.E.2d 160 (1968), *trans. denied,* sovereign immunity was abolished as to counties. Finally, in *Campbell,* our supreme court as a general rule abolished sovereign immunity as to the State itself, stating, "the elimination of sovereign immunity means a more equitable distribution of losses in society caused by the government unto members of society, rather than forcing individuals to face the total loss of the injury." *Campbell,* 259 Ind. at 61, 284 N.E.2d at 736. The *Campbell* court recognized three areas in which common law sovereign immunity still would apply: with respect to claims of inadequate police protection to prevent crime, with respect to claims of a state official appointing an incompetent person to a post, and with respect to judicial decisions. *Id.* at 62–63, 284 N.E.2d at 737.

■ In response to *Campbell,* the General Assembly enacted ITCA in 1974. *See King v. Northeast Sec., Inc.,* 790 N.E.2d 474, 478 (Ind.2003). ITCA specifies twenty-three activities for which the State and its agencies and political subdivisions enjoy complete immunity from tort liability. I.C. § 34–13–3–3. ITCA also limits the total monetary damages to which a government entity may be exposed and eliminates the possibility of punitive damages. I.C. § 34–13–3–4. Additionally, ITCA provides a time period for notifying a government entity of a potential claim that is much shorter than the statute of limitations for tort actions. I.C. §§ 34–13–3–6 (270 days for claims against the State and State agencies) and 34–13–3–8 (180 days for claims against political subdivisions of the State).[4] Thus, ITCA places substantial hurdles in the way of injured persons wanting to sue the State or one of its agencies or political subdivisions. It represents a derogation of common law as established by *Campbell* and its immediate predecessors and, therefore, it must be strictly construed against limitations on a claimant's right to bring suit. *Greater Hammond Cmty. Servs., Inc. v. Mutka,* 735 N.E.2d 780, 782 (Ind.2000).

Indiana courts have recognized limited circumstances in which private entities named as a defendant in a tort lawsuit may enjoy the benefits of ITCA. Our supreme court has held, "When private individuals or groups are endowed by the state with powers or functions governmental in nature, they become agencies or instrumentalities of the state and are subject to the laws and statutes affecting governmental agencies and corporations." *Ayres v. Indian Heights Volunteer Fire Dep't Inc.,* 493 N.E.2d 1229, 1235 (Ind. 1986) (citing *Evans, et al. v. Newton, et al.,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966)). At issue in *Ayres* was whether a volunteer fire department with an annual

---

4. Though now subsumed within ITCA, the first statute requiring early notice to municipalities of an injury as a prerequisite to filing suit was enacted in 1907. *See Aaron v. City of Tipton,* 218 Ind. 227, 230, 32 N.E.2d 88, 89(1941).

budget of $27,500 was protected by ITCA. Our supreme court held that it was, noting that "[t]he need to control, prevent, and fight fires for the common good of the community has been universally accepted as a governmental function and duty in this State and, as far as we can determine, in this Nation from its very beginning." *Id.* (citing 57 Am.Jur.2d § 256). It also noted the statutory authority under which volunteer fire departments are created and observed that the fire department under consideration "was composed of volunteer citizens of the township to provide a specific service to that specific geographic area pursuant to statutory authorization and at the behest of the elected township authority," and that the $27,500 contract price "could reasonably be determined to be nominal in amount. . . ." *Id.* at 1237.

■ A panel of this court applied *Ayres* in *Metal Working Lubricants Company v. Indianapolis Water Company*, 746 N.E.2d 352 (Ind.Ct.App.2001). The issue in that case was whether IWC could be held liable on a claim that it failed to provide adequate water for firefighting purposes in hydrants that IWC serviced. This court first addressed whether IWC was a "governmental agency" for immunity purposes. Counsel for IWC, however, repeatedly conceded throughout the litigation that IWC was *not* a governmental entity for purposes of ITCA. Nonetheless, this court concluded that IWC was a governmental agency and that it enjoyed common law immunity from liability with respect to claims regarding firefighting, because it was closely akin to the provision of police services, which our supreme court in *Campbell* had noted was an exception to its general abolition of the doctrine of sov-

ereign immunity. To emphasize, *Metal Working* addressed only whether IWC could be liable for its negligence under common law principles, not whether ITCA applied.[5]

Obviously, Veolia wishes us to apply the *Metal Working* holding directly to it, IWC's practical successor, and conclude that Veolia is a governmental entity for purposes of ITCA as well. We decline to do so. We do not necessarily disagree with the ultimate holding of the *Metal Working* case, namely that a water utility cannot be liable on a claim that it failed to provide adequate water for firefighting purposes. *See Cross v. City of Kansas City*, 230 Kan. 545, 638 P.2d 933, 936–37 (1982) (holding that municipal water utility was immune from liability on claim that it failed to furnish adequate water for firefighting purposes). However, given the limited scope of *Metal Working's* ultimate holding and what it actually decided (and did *not* decide), it is not authority for the proposition that Veolia ought to be considered a governmental entity or political subdivision of the State for purposes of ITCA.

We instead conclude, after considering the evident purposes of ITCA and the development of the common law predating ITCA's adoption, that Veolia is not a governmental entity or a political subdivision of the State entitled to ITCA's protections. The most fundamental basis for this holding is that the courts of Indiana have *never* recognized the provision of utility services as a power or function "governmental in nature" that gave rise to sovereign immunity, even when a governmental unit was

5. It is important to note that ITCA is not the final word on whether a governmental entity may be liable for its negligence, although it is the first word. "In general, it is only after a determination is made that a governmental

defendant is not immune under the ITCA that a court undertakes the analysis of whether a common law duty exists under the circumstances." *Benton v. City of Oakland City*, 721 N.E.2d 224, 232 (Ind.1999).

operating the utility. We presume the General Assembly was well aware of the fact that utilities, whether privately or publicly owned, *never* enjoyed any special treatment or immunity from liability. If the General Assembly wanted to alter this arrangement, it clearly could have done so when it enacted ITCA by expressly including utilities, publicly-owned or otherwise, within the definition of "political subdivision." It did not.

Our supreme court has repeatedly stated:

> "When the legislature enacts a statute in derogation of the common law, this Court presumes that the legislature is aware of the common law, and does not intend to make any change therein beyond what it declares either in express terms or by unmistakable implication. In cases of doubt, a statute is construed as not changing the common law."

*Stanley v. Walker*, 906 N.E.2d 852, 862 (Ind.2009) (quoting *Bartrom v. Adjustment Bureau, Inc.*, 618 N.E.2d 1, 10 (Ind. 1993)). Here, under the common law, utilities, publicly or privately owned, were legally considered identical to private corporations. Nothing in the express language of ITCA changes that, nor does any unmistakable implication.

■ We also do not believe extending ITCA's protections to Veolia, particularly with respect to an "ordinary" tort claim, would be consistent with ITCA's apparent purposes. This court has observed in holding that ITCA's notice provisions are constitutional:

[I]t appears that our statute establishes governmental tortfeasors as a classification entitled to notice to permit prompt investigation of claims. Governmental units are different from private tortfeasors. There are basic differences in the manner and responsibility of passing on claims and the sources of funds used to compensate those innocently injured. The nature of the employment process of their agents and servants also differs. Consideration of these differences is proper since litigation is not the only means of compensating injured individuals.

*Batchelder v. Haxby*, 167 Ind.App. 82, 84–85, 337 N.E.2d 887, 889 (1975). As this language indicates, one of the main concerns ITCA intended to address clearly was protection of the public treasury from a multitude of tort lawsuits. *See also* Jack M. Sabatino, *Privatization and Punitives: Should Government Contractors Share the Sovereign's Immunities from Exemplary Damages?*, 58 Ohio St. L.J. 175, 199 (1997) (noting that concept of sovereign immunity "may be substantially predicated on protecting the public treasury, and thereby the taxpayers at large, from what could be enormous monetary liabilities if government were held legally accountable in civil litigation in exactly the same fashion as private entities and persons."). That concern is not present with Veolia.

■ Simply put, we cannot discern a legislative intent to shield or provide special protections to for-profit enterprises, including ones that are part of a multinational, multi-billion-dollar conglomerate, because they provide services to a governmental entity.[6] Indeed, one of the key fac-

---

**6.** Veolia asserts that evidence submitted by Harrison related to VWNA's and VE's corporate structure is irrelevant and should have been stricken by the trial court. We conclude such evidence is relevant in deciding whether Veolia, a wholly-owned subsidiary of VWNA, itself a subsidiary of VE, ought to be afforded protection under ITCA's umbrella, even if Harrison is not attempting to "pierce the corporate veil" in order to reach VWNA's and VE's assets. Veolia also asserts this evidence, which was gleaned largely from VE's website, was inadmissible hearsay. However, Indiana adheres to the rule that in order to be admis-

tors that led our supreme court in *Ayres* to conclude that the volunteer fire department was a governmental entity was the "nominal" amount of its contract with the municipality it served. *Ayres*, 493 N.E.2d at 1237. Veolia's $40 million-plus per year contract with the Department cannot be considered "nominal."

Veolia also contends it should be considered a political subdivision of the State because the Management Agreement between Veolia and the Department subjects Veolia to extensive control by the Department. Veolia relies upon *World Productions, Inc., v. Capital Improvement Board*, 514 N.E.2d 634, 637 (Ind.Ct.App.1987), *trans. denied*, wherein this court held that " 'any entity that is '(1) created directly by the State, so as to constitute a department or administrative arm of the government, or (2) administered by individuals who are controlled by public officials and responsible to such officials or the general public' ' " should be deemed to be a political subdivision of the State for ITCA purposes. The *World Productions* panel derived this test from *Brock v. Chicago Zoological Society*, 820 F.2d 909, 910 (7th Cir. 1987), which was addressing the federal Occupation Safety and Health Act; the panel did not discuss or even cite *Ayres*.

Our supreme court has expressed doubt about *World Productions'* viability, specifically when faced with claims by a private organization that a contract with a government body has transformed the private organization into a political subdivision of the State. *See Mutka*, 735 N.E.2d at 783. Instead, it has plainly said, "A group that is neither specifically named a political subdivision by statute nor engaged in the provision of uniquely governmental services may not receive the protection of the Indiana Tort Claims Act by contracting to be managed by an established governmental entity." *Id.* at 784. In light of *Mutka*, Veolia's claim that the Management Agreement it voluntarily entered into with the Department has transformed it into a political subdivision of the State for ITCA purposes clearly is not a viable argument.

■ Veolia also contends it should be entitled to ITCA protection because it is contractually required to comply with various rules and regulations for water utilities established by federal and state statutes, the Indiana Utility Regulatory Commission, and the Indiana Water Pollution Control Board. These rules and regulations, including Indiana Code Section 13–18–16–6 that Veolia cites,[7] are essentially health

---

sible at a summary judgment hearing, evidence need not necessarily be in a form that would be admissible at trial, so long as the substance of the evidence would be admissible. *See Reeder v. Harper*, 788 N.E.2d 1236, 1241–42 (Ind.2003). Veolia has not persuaded us that the information regarding the corporate structure of Veolia–VWNA–VE would not be admissible at a trial. We recognize, however, that this evidence may only be relevant to whether Veolia is entitled to ITCA's protections and not to the substance of Harrison's underlying negligence claim.

7. Indiana Code Section 13–18–16–6 provides:
   (a) All public water systems shall be continuously operated and maintained so that water is:

(1) safe in quality;
(2) clean and adequate in quantity; and
(3) chemically satisfactory for ordinary domestic consumption.
(b) The person responsible for the operation of a public water system shall take all measures that are necessary to carry out the requirements of subsection (a) so as to protect the quality and quantity of the raw water supply from actual or threatened contamination. These measures include the relocation of the point of raw water collection to a site that is not contaminated or threatened by contamination.
(c) The failure to carry out a duty set forth in subsection (a) or (b) constitutes a violation subject to the penalties imposed under this chapter. Each day a violation occurs

and safety or environmental regulations for drinking water. Veolia, having voluntarily chosen to enter the business of supplying water to a municipality, certainly must have been aware of those regulations and likely figured the cost of complying with them into its equation when deciding how much to charge the Department for its services and still make a profit. Put another way, there are many businesses and industries that are subject to extensive public health and safety and environmental regulations, but it cannot be that requiring a business or other entity to comply with such regulations transforms that business or entity into a governmental body. Our supreme court plainly has indicated that the operation of a utility, whether by a municipality or private entity, is a "private business" matter, even though the utility may be subject to extensive regulation by the State. *See City of Logansport*, 202 Ind. at 534–35, 177 N.E. at 253.

## Conclusion

We hold that Veolia is not a political subdivision of the State for purposes of ITCA. The trial court erred in concluding otherwise and granting Veolia's motion for summary judgment on the basis that Harrison failed to provide Veolia with notice of his injury pursuant to ITCA. We reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

Reversed and remanded.

BAILEY, J., and MAY, J., concur.

under this section constitutes a separate violation.